UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
MICHAEL SAVINO,                                           :
                                    Plaintiff,            :
                                                          :     <u>MEMORANDUM AND ORDER</u>
                  -against-                               :     07 -CV- 4233 (DLI)
                                                          :
MICHAEL J. ASTRUE,                                        :
Commissioner of the Social Security                      :
Administration,                                           :
                                    Defendant.            :
--------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

Plaintiff Michael Savino brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of defendant, the Commissioner of the Social Security Administration ("SSA"), that plaintiff was not disabled within the meaning of the Social Security Act ("the Act") from November 29, 1994, when he first claimed disability, until the expiration of his insured status on December 31, 2000. Defendant moves for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), seeking affirmation of his denial of benefits, and plaintiff cross-moves for judgment on the pleadings. For the reasons set forth below, defendant's motion is denied, the decision of the SSA is reversed, and plaintiff's motion is granted to the extent that the case is remanded for further administrative proceedings.

    I.       Background

         a.  Prior Proceedings

Plaintiff applied for disability insurance benefits ("DIB") on April 19, 1995, alleging that he had been disabled since November 29, 1994 due to neck, back, and arm problems resulting from osteoarthritis. (Admin. Transcript ("Tr.") at 31, 76-79.)

1

His application was denied initially and after reconsideration. (Tr. at 80-83, 86-89.) Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. at 90-92.) ALJ Manuel Cofresi held the hearing on June 12, 1996, at which plaintiff testified. (Tr. at 45-75.) By a decision dated August 29, 1996, ALJ Cofresi found that plaintiff was not disabled within the meaning of the Act. (Tr. at 28-35.) On February 26, 1998, that decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review. (Tr. at 19-20.)

Plaintiff then sought judicial review in this court of the denial of benefits pursuant to 42 U.S.C. § 405(g). *Savino v. Apfel,* CV-98-3229. On January 20, 1999, the court held oral arguments. (Tr. at 448.) On January 25, 1999, the court remanded the case for further proceedings in order to resolve two conflicting opinions (dated May 23, 1995 and March 25, 1996) of the patient's treating physician, Dr. Arthur E. Farkash.[1] (Tr. at 440, 447-48.) On May 11, 2001, the Appeals Council vacated the final decision of the Commissioner and remanded the case to ALJ Cofresi for further proceedings consistent with the court's order. (Tr. at 462-65.) ALJ Cofresi held a second hearing on July 2, 2002, at which plaintiff and Dr. Justin Willer, an independent medical expert, testified. (Tr. at 944-1009.) On August 21, 2003, ALJ Cofresi ruled that plaintiff was not disabled within the meaning of the Act during the relevant period, from November 29, 1994 to December 31, 2000. (Tr. at 740-51.) With respect to the conflicting opinions, ALJ Cofresi found "that the discrepancies between Dr. Farkash's assessments are not supported by objective clinical or diagnostic

---

[1] Dr. Farkash is a neurologist, and has treated plaintiff since August 1994, seeing

findings." (Tr. at 749.)

On October 23, 2003, plaintiff appealed, and the Appeals Council, by order of August 6, 2005, remanded the case to a new ALJ for an additional hearing to: (1) review all evidence received after July 2, 2002; (2) obtain new medical testimony from a new expert; (3) resolve any conflicting evidence; and (4) use a vocational expert to assist in determining whether plaintiff could perform his prior work. (Tr. at 753-767.) On November 22, 2005, ALJ Seymour Fier presided over the third administrative hearing on this matter. (Tr. at 1010-27.) On January 25, 2006, he issued a decision finding that plaintiff had not been disabled on or before December 31, 2000. (Tr. at 421-29.) ALJ Fier found that throughout the relevant period, plaintiff was able to perform sedentary work and therefore, was able to perform his prior work. (*Id.*) On August 11, 2007, ALJ Fier's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review. (Tr. at 258-60.) Plaintiff has appealed that decision to this court.

### b. Non-Medical and Testimonial Evidence

Plaintiff was born on May 23, 1951 and was 43 years old when he first applied for disability insurance benefits. (Tr. at 948.) For approximately 17 years, he worked for New York Hospital in Queens. (Tr. at 951.) Plaintiff was a sergeant supervisor in charge of the hospital's security guards. (Tr. at 951.) In this capacity, he "scheduled the men, put them on post, did [his] log work, checked the men on post, [and] watched the monitors." (*Id.*) Occasionally, plaintiff had to restrain unruly patients. (Tr. at

---

him about every three months. (Tr. at 13-16, 164, 745.)

952.) According to plaintiff, the job involved six hours of sitting and two hours of walking a day. (Tr. at 50.)

On November 11, 1992, plaintiff underwent a surgical fusion of the cervical vertebrae with bone graft at C4-5 and C5-6. (Tr. at 952-53.) Plaintiff returned to work three months after the surgery. (Tr. at 953.) According to plaintiff, when he first returned to work, the pain "wasn't too bad, but then as time went, as it kept on going . . . [he] couldn't sleep and the pain was really horrendous, and . . . the headaches wouldn't go away." (*Id.*) Plaintiff stopped working on September 29, 1994 due to "terrible pain" in his neck, arms, and head as well as "terrible headaches." (Tr. at 50.) Plaintiff testified that the headaches occurred daily and would "last for hours." (Tr. at 954.) The neck pain radiated to both arms and would cause numbness in his right arm and weakness in both hands. (Tr. at 955.) Plaintiff also suffered from arthritis in his left knee, on which he had cartilage and ligament surgery in 1992. (Tr. at 958.)

These symptoms continued after plaintiff stopped working. (Tr. at 955.) Additionally, plaintiff testified that he suffers from "more pains now in different areas of [his] body . . . [including his] lower back [and] legs." (*Id.*) Plaintiff testified that "every day there's some sort of pain running down [his] leg," and he suffers from back pain "a couple of times a week." (Tr. at 956-58.) Plaintiff testified that his "right hand is always numb," and because he is right handed, "a couple of times a week," he drops light objects such as keys or silverware. (Tr. at 957.) Plaintiff testified that he is never able to sit comfortably, and if he sits for an hour or more, he needs to "move

around," take pain killers, like Darvocet or Vicodin, and lay down with a heating pad. (Tr. at 961.) Plaintiff testified that, at most, he could stand for fifteen minutes, and he cannot stand straight. (*Id.*) On a "good day," plaintiff testified that he can walk two blocks. (Tr. at 962.) Pain and weakness in his legs prevent him from walking farther. (*Id.*)

At the June 12, 1996 hearing, plaintiff testified about his day-to-day activities. The only chores he does are cook dinner, light shopping, and washing pots and dishes. (Tr. at 70-71.) Plaintiff testified that while he can attend to his personal care, shaving is difficult because of weakness and numbness in his right arm. (Tr. at 71.) "A couple of times a week," he drives to the supermarket that is two blocks from his house to do light grocery shopping for dinner, "if the pain isn't too bad." (Tr. at 64, 70.) Sometimes, he drives to the park and sits by the lake. (Tr. at 70.)

The longest distance that plaintiff has driven since 1994 was "roughly a half hour [*sic*] ride" from Flushing, Queens to Huntington, Nassau County. (Tr. at 64.) He has taken long-distance driving trips, with his wife driving, to the Poconos and Atlantic City. (Tr. at 73-74.) The former lasted for about "an hour, hour and a half[,]" and the latter lasted for about two-and-a-half hours. (*Id.*) Plaintiff took stops every "half hour, forty-five minutes," during both trips and the trips made him feel "terrible" and "crippled." (*Id.*) Plaintiff testified that, while in the Poconos, he stayed at the hotel most of the time and sat by the pool. (Tr. at 65.) While in Atlantic City, he occasionally played the slot machines for short periods and sat in the pool. (Tr. at 66.)

At the July 2, 2002 hearing, plaintiff testified that the only meals he prepares are simple lunches, such as "a sandwich or something," and that he "do[es] a little dishes sometimes." (Tr. at 963.) Plaintiff testified that, although driving is "a little tough," he has adjusted to it: for example, he uses his mirrors to drive because he "can't turn [his] head like all the way." (Tr. 964.) He typically drives six blocks or less. (Tr. at 964-65.) Plaintiff routinely needs to lie down twice a day. (Tr. at 965-66.) Since the last hearing, plaintiff went on a seven-day cruise from New York to Bermuda. (Tr. at 972-73.) During the cruise, he spent most of his time sitting on the deck. (Tr. at 972.) He also played the slot machines, danced with his wife, and disembarked the ship once to make a phone call. (Tr. at 973-74.)

      c.  Medical Evidence Prior to November 29, 1994

From July to November 1992, plaintiff suffered neck and arm pain with numbness in his arms caused by herniated disks in his neck. (Tr. at 181.) On November 3, 1992, plaintiff underwent a C4-5 and C5-6 anterior cervical discectomy with iliac bone graft to treat these herniated disks. (*Id.*) The hospital discharged him eight days later in a stable condition. (*Id.*)

On April 7, 1994, a magnetic resonance image ("MRI") of plaintiff's cervical spine revealed "status post surgical changes at the 4-5 and 5-6 level with mild stenosis at the 4-5 level and mild to moderate stenosis at the 5-6 level." (Tr. at 530.) On August 16, 1994, plaintiff's physician examined him for recurring neck pains. (Tr. at 247-48.) The examination revealed a limited range of motion. (Tr. at 248.) The doctor ruled out radiculopathy and prescribed physical therapy. (*Id.*) In November

1994, plaintiff had renewed pain in his neck, right shoulder, and right arm, as well as upper extremity numbness and weakness. (Tr. at 243.)

       d.  Medical Evidence from November 29, 1994 to December 31, 2000

On November 29, 1994, plaintiff was treated in the emergency room for nausea, dizziness, shortness of breath, and heart palpitations. (Tr. at 213.) On November 30, 1994, a Computerized Axial Tomography scan of plaintiff's cervical spine revealed status post fusion of his C4-5, C5-6, and C6-7 and mild indentation of the thecal sac at C5 and C6 from vertebral body osteophytes. (Tr. at 219.) A cervical myelogram performed on the same day revealed post surgical changes at C5-6 and C6-7. (Tr. at 220.)

On December 23, 1994, Dr. Norman Marcus, the director of the pain treatment program at Lennox Hill Hospital, conducted an upper body examination of plaintiff. (Tr. at 132-34.) The examination showed that plaintiff could not fully rotate his body. (Tr. at 133-34.) Dr. Marcus recommended trigger-point injections, physical therapy, and a comprehensive pain rehabilitation program. (Tr. at 134.) On February 23, 1995, Dr. Marcus found that plaintiff "responded dramatically to trigger point injections to his right shoulder girdle," and that he had a full range of motion in his right shoulder. (Tr. at 128.) Dr. Marcus noted that plaintiff continued to complain of persistent pain deep in his posterior cervical region. (*Id.*) Dr. Marcus observed "intermittent spasms in his shoulders and cervical paraspinal region." (*Id.*) The doctor indicated that these spasms "could be associated with his persistent complaints of deep tension-like pain in his neck." (*Id.*)

On May 23, 1995, Dr. Farkash completed a residual functional capacity assessment of plaintiff. (Tr. at 164-73.) He reported that plaintiff had minimal response to trigger-point injections. (Tr. at 164.) Dr. Farkash concluded that plaintiff has "no limitation" to stand, walk, or sit. (Tr. at 172.) He also concluded that plaintiff has "limited" ability to lift, carry, push, and pull due to "hand weakness." (*Id.*)

On July 14, 1995, Dr. Roger Antoine, an orthopedist, performed a consultative examination of plaintiff. (Tr. at 174-77.) During the examination, plaintiff walked independently with a limp in his lower left extremity. (Tr. at 175.) Plaintiff could barely stand up and walk on his toes. (*Id.*) Plaintiff could do a half squat while holding objects and was able to get on and off of the examination table independently. (*Id.*) Dr. Antoine found plaintiff's shoulder and elbow muscle strength to be 4/5 on the right and 5/5 on the left. (Tr. at 176.) Plaintiff's muscle strength in both wrists was 5/5. (*Id.*) Dr. Antoine's impressions were status post left knee arthrotomy, status post cervical anterior fusion with right iliac bone graft at C4-5 and C5-6, cervical spinal stenosis, lumbar spinal stenosis, right cervical radiculopathy, and bilateral lumbar radiculopathy. (Tr. at 177.)

On July 31, 1995, Dr. C. Ladopoulos performed a residual functional capacity assessment on behalf of the SSA. (Tr. at 121-27.) He concluded that plaintiff could: (1) occasionally lift and/or carry 20 pounds; (2) frequently lift and/or carry ten pounds; (3) stand and/or walk with normal breaks for about six hours in an eight-hour workday; and (4) sit, with normal breaks, for about six hours in an eight-hour workday. (Tr. at 122.) The doctor also found that plaintiff's ability to push and pull was limited. (*Id.*)

Dr. Alan Kaye, another state medical agency consultant, produced a similar residual capacity assessment on November 9, 1995, concluding that plaintiff was capable of performing light work. (Tr. at 114-20.)

On March 25, 1996, Dr. Farkash filed a report indicating that the trigger-point injections had significantly improved the muscle spasms in plaintiff's neck and upper back. (Tr. at 237.) The report also indicated that plaintiff continued to suffer from decreased motion and chronic pain. (Tr. at 237-38.) Dr. Farkash concluded that "it is unclear if [plaintiff] will be able to return to his prior occupation . . . and [t]his disability has left the patient unable to perform any degree of physical activity, sit or stand for extended lengths of time." (Tr. at 238.)

On July 7, 1997, Gerard Desmond, a physical therapist, performed a functional capacity evaluation of plaintiff. (Tr. at 5-8.) Desmond observed that plaintiff could sit for one hour and 20 minutes continuously, stand for 53 minutes continuously, and walk for five minutes and 12 seconds continuously. (Tr. at 7.) Plaintiff frequently shifted positions while sitting and walked with an impaired gait. (*Id.*) Desmond concluded that plaintiff would have difficulty returning to work. (*Id.*)

Dr. Farkash provided an updated residual functional capacity assessment on August 27, 1997. (Tr. at 17-18.) He opined that plaintiff occasionally could lift and carry, at most, ten pounds. (Tr. at 17.) He reported that plaintiff could not use either hand to grasp, push, or pull, and that he could not perform fine manipulations. (*Id.*) In an eight-hour workday, he opined that plaintiff could sit for only three hours and stand and/or walk for three hours. (*Id.*)

9

In February 1998, Dr. Jeffery L. Cole, who was working with plaintiff on his physical therapy, reported that plaintiff had limited cervical range of motion on all planes with pain at the extremes of extension and lateral bending. (Tr. at 510-12.) After plaintiff's next visit in May 1998, Dr. Cole reported that there had been "little if any advances in [plaintiff's] cervical range or pain patterns." (Tr. at 508.)

Dr. Farkash treated plaintiff throughout 1998. (Tr. at 274-76, 505-06, 509.) The objective exams showed persistent diminished range of motion but revealed no new findings. (*Id.*)

Starting on January 4, 1999, Dr. Catherine Sullivan, a rheumatologist, began treating plaintiff regularly for pain in his lower back and joint pain in his hand, elbows, and knees. (Tr. at 544-56.) Dr. Sullivan took x-rays of plaintiff's wrists, hands, elbows, and knees on September 26, 1999. (Tr. at 579-583.) According Dr. Sullivan, the x-rays did not reveal abnormalities or evidence of active pathology with respect to plaintiff's wrists, hands, and elbows. (Tr. at 579-582.) The x-rays did show degenerative osteoarthrosis of plaintiff's left knee. (Tr. at 583.) She found nodules on plaintiff's elbows and had a rheumatoid nodule removed from plaintiff's left elbow on October 25, 1999. (Tr. at 549-53, 804-19.)

Plaintiff had MRIs taken of his spine on August 29 and October 24, 2000. (Tr. at 281-82, 389-90, 500-01, 560, 586-87, 934-35.) The first MRI revealed conditions that were "consistent with degenerative disk disease." (Tr. at 281.) Dr. Han Kim reviewed the second MRI and his impression was that plaintiff had "mild degenerative disc status throughout the lumbar spine." (Tr. at 390.)

e. Medical Evidence after December 31, 2000

On October 26, 2001, Dr. Farkash submitted a report describing plaintiff's cervical spine impairments. (Tr. at 473-79.) Dr. Farkash diagnosed plaintiff with cervical disc disease, cervical myelopathy, cervical strain, and cervical radiculopathy. (Tr. at 473.) The report explained that medication did not completely alleviate plaintiff's pain. (Tr. at 475.) According to the report, in an eight-hour workday, plaintiff could only sit for five hours and stand/walk for two hours. (Tr. at 476.) When sitting, plaintiff must get up and move around every 15 minutes before he can sit down again. (*Id.*) At most, plaintiff occasionally could lift and carry ten pounds. (*Id.*) Based on these limitations, Dr. Farkash concluded that plaintiff could not perform a full-time competitive job. (*Id.*)

On March 14, 2002, Dr. Farkash wrote a letter to ALJ Cofresi regarding his assessments of plaintiff's limitations and specifically, the discrepancy between his descriptions of plaintiff's limitations in his May 23, 1995 and March 25, 1996 reports. (Tr. at 534.) The former stated that there was "no limitation" in plaintiff's ability to stand, walk, and sit. (Tr. at 172.) The latter stated that plaintiff is "unable to perform any degree of physical activity, sit or stand for extended lengths of time." (Tr. at 238.) In his letter, Dr. Farkash explained that his report of plaintiff's "limitations [was] based strictly on [plaintiff's] subjective complaints, [*sic*] there were no objective clinical findings, laboratory or diagnostic tests that showed any abnormality." (Tr. at 534.) Dr. Farkash conceded that "[t]here are no objective findings on neurologic examination, nor were there any corroborating diagnostic studies to show

progression of any underlying deficit as a result of his cervical spine disease." (*Id.*)

On July 2, 2002, Dr. Justin Willer provided expert medical testimony before ALJ Cofresi. (Tr. at 978-1008.) Dr. Willer explained that there were significant portions of the medical record that he could not reconcile, most notably, the opinions of "the majority of his treating physicians . . . that he got better [after surgery] with the exception of Dr. Farkash." (Tr. at 993.) Dr. Willer did not find anything in the reports of plaintiff's treating physicians that indicated current neurologic deficits. (*Id.*) Dr. Willer also did not find "clear-cut evidence that [plaintiff] has any current radiculopathies." (*Id.*)

On July 17, 2002, Dr. Milton Smith, an orthopedist, examined plaintiff. (Tr. at 598-604.) He diagnosed plaintiff with "status post cervical fusion, lumbosacral radiculopathy, degenerative changes of the upper and lower extremities, and status post surgical procedures to the left elbow and left knee." (Tr. at 604.) Based on the examination, Dr. Smith concluded that plaintiff "has a total permanent disability." (*Id.*)

On September 20, 2005, Dr. Farkash submitted a spinal impairment questionnaire regarding plaintiff's disabilities. (Tr. at 923-929.) He reported that plaintiff suffers from lumbar radiculopathy and cervical pain, and that the prognosis is stable. (Tr. at 923.) Dr. Farkash stated that in an eight-hour workday, plaintiff can only sit for one hour and stand/walk for zero to one hour. (Tr. at 926.) At most, plaintiff is capable of occasionally lifting and carrying ten pounds. (Tr. at 926-27.) During an eight-hour workday, plaintiff would require breaks every hour and he

would not be able to keep his neck in a constant position. (Tr. at 928.)

On November 22, 2005, Dr. Zei Kahanowicz, an orthopedist, testified that plaintiff's conditions did not meet or equal the conditions recognized by the Listing of Impairments. (Tr. at 1017.)

In a Spinal Impairment Questionnaire originally dated November 28, 2005 and updated on August 1, 2006, Dr. Sullivan reported that various clinical findings—including spasms and tenderness of the paralumbar musculature, an abnormal gait with use of a cane, bilateral knee crepitus, and knee x-rays—indicated that plaintiff could not work at all. (Tr. at 339-41, 343.) She noted that plaintiff is so limited by his impairments that he had to "alter all activities of his lifestyle . . . ." (Tr. at 342.)

## II.    Discussion

### a.  Standard of Review

Unsuccessful claimants for disability benefits under the Act may bring an action in federal district court seeking judicial review of the Commissioner's denial of their benefits "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow." 42 U.S.C. § 405(g). A district court reviewing the final determination of the Commissioner must determine whether the ALJ had applied the correct legal standards and whether substantial evidence supports the decision. *See Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998). The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's]

regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (internal quotation marks omitted). The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A remand by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004). A remand to the Commissioner is also appropriate "[w]here there are gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)). ALJs, unlike judges, have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999).

b.  Disability Claims

In order to receive disability benefits, claimants must be "disabled" within the meaning of the Act. *See* 42 U.S.C. § 423(a),(d). Claimants establish disability status by demonstrating an "inability to engage in any substantial gainful activity by reason

of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant bears the initial burden of proof on disability status and is required to demonstrate disability status by presenting "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques," as well as any other evidence that the Commissioner may require. 42 U.S.C. § 423(d)(5)(A); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

An ALJ must adhere to a five-step inquiry to determine whether a claimant is disabled under the Social Security Act as set forth in 20 C.F.R. § 404.1520. If, at any step, the ALJ finds that the claimant is either disabled or not disabled, the inquiry ends. First, the claimant is not disabled if he or she is working and performing "substantial gainful activity." 20 C.F.R. § 404.1520(b). Second, the ALJ considers whether the claimant has a "severe impairment" without reference to age, education, or work experience. 20 C.F.R. § 404.1520(c). Impairments are "severe" when they significantly limit a claimant's physical or mental "ability to do basic work activities." *Id.* Third, the ALJ will find the claimant disabled if his or her impairment meets or equals any impairment listed in Appendix 1.[2] *See* 20 C.F.R. § 404.1520(d).

If the claimant is found to have a "severe impairment," but the impairment is not listed in Appendix 1 and does not meet or equal an impairment listed in Appendix 1, the ALJ makes a finding about the claimant's "residual functional capacity" in

---

[2] 20 C.F.R. pt. 404, subpt. P, app. 1.

steps four and five. 20 C.F.R. § 404.1520(e). In the fourth step, the claimant is not disabled if he or she is able to perform "past relevant work." 20 C.F.R. § 404.1520(f). Finally, in the fifth step, the ALJ determines whether the claimant could adjust to other work existing in the economy, considering factors such as age, education, and work experience. In this step, the burden shifts to the Commissioner to demonstrate that the claimant could perform other work. *See Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (citing *Carroll*, 705 F.2d at 642). If so, the claimant is not disabled. 20 C.F.R. § 404.1520(g).

c. ALJ Fier's Decision

ALJ Fier applied the five-step analysis set forth in 20 C.F.R. § 404.1520. He resolved step one in plaintiff's favor, as plaintiff has not performed substantial gainful activity since the onset of the alleged disability on November 29, 1994. (Tr. at 422.) At step two, ALJ Fier found that plaintiff's impairments qualify as "severe." (Tr. at 423.) Based on the testimony of Dr. Kahanowicz, an impartial medical expert, ALJ Fier ruled in step three against plaintiff, finding that his impairments did not meet or medically equal one of the impairments in Appendix 1 of 20 C.F.R. § 404.1520(d). (*Id.*) ALJ Fier discredited plaintiff's testimony regarding his pain and limitations, finding that plaintiff's "statements concerning his impairments and their impact on his ability to work are not entirely credible in light of the claimant's own description of his activities and lifestyle, the medical history and reports of treating and examining practitioners, and the hearing testimony." (*Id.*)

With respect to plaintiff's residual functional capacity, ALJ Fier found that

plaintiff was capable of performing the full range of sedentary work[3] throughout the disability period. (Tr. at 427-28.) Because ALJ Fier decided that plaintiff's past work as a security supervisor qualified as sedentary work, he found that plaintiff was able to perform his past work and was not disabled within the meaning of the Act on or before December 31, 2000. (*Id.*) As such, ALJ Fier did not consider step five of the analysis. (*Id.*)

### d. Application

The Commissioner moves for judgment on the pleadings, seeking affirmation of his denial of benefits on the grounds that the ALJ applied the correct legal standards to determine that plaintiff was not disabled and that the factual findings are supported by substantial evidence. Plaintiff opposes the motion and cross-moves for judgment on the pleadings on the grounds that: (1) ALJ Fier failed to comply with the Appeals Council's order; (2) both ALJ Fier and the Appeals Council improperly disregarded reports from treating physicians; and (3) ALJ Frier improperly discredited plaintiff's testimony. The court finds that ALJ Fier failed to follow the orders of the Appeals Council, the Appeals Council failed to follow the treating

---

[3] Sedentary work is defined as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

physician rule, and ALJ Fier improperly discredited plaintiff's testimony.

    1.    ALJ Fier Did Not Comply with the Appeals Council's Order.

An ALJ commits legal error requiring remand when he does not abide by a remand order from the Appeals Council. *See* 20 C.F.R. § 404.977(b) ("The administrative law judge shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order."); *see also Scott v. Barnhart*, 592 F. Supp. 2d 360, 371 (W.D.N.Y. 2009) ("The ALJ's failure to comply with the Appeals Council's order constitutes legal error, and necessitates a remand.") (citations omitted); *Mann v. Chater*, No. 95 CIV. 2997(SS), 1997 WL 363592, at *1-2 (S.D.N.Y. June 30, 1997) (holding that the case must be remanded when the ALJ did not follow the orders of the Appeals Council). Here, ALJ Fier did not comply with the Appeals Council's remand order, which mandated that "[t]he Administrative Law Judge *will* . . . obtain new testimony from a different medical expert . . . to assist in resolving *any* conflicts or inconsistencies in the evidence . . . and obtain vocational expert testimony to assist with both the *step 4* and step 5 analysis." (Tr. at 767 (emphasis added).)[4]

Despite these explicit instructions, ALJ Fier confined the new medical expert's testimony to resolving the conflict between Dr. Farkash's May 23, 1995 and March 25, 1996 assessments and considering one other exhibit, which covered plaintiff's

---

[4] Defendant mischaracterizes these mandates as "recommendations." (*See, e.g.*, Def.'s Reply at 2 ("The Appeals Council order recommended . . . obtaining . . . vocational expert . . . testimony to aid in determining plaintiff's ability to return to past relevant work.").) The Appeals Council's use of the word "will" clearly demonstrates that the tasks it set forth for ALJ Fier were mandatory.

medical history from 2000-2002. (Tr. at 1021-22.) Furthermore, the hearing transcript shows that the medical expert did not have significant portions of the medical record, including various treatment charts of Dr. Farkash. (Tr. at 1019-1023.) When plaintiff objected to this, arguing that the medical expert cannot carry out the mandate of the Appeals Council without reviewing all of the relevant evidence, the following exchange occurred:

> ALJ: [The medical expert] was provided with all the material. The folder that he was given was something that was mailed to him. But as far as the rest of the medical exhibits. If he needed any additional inquiry into other exhibits. That was always available to him. He has not requested—
> Plaintiff: —Your Honor, he already testified that he didn't look at the other charts. That he did not review this chart.
> ALJ: Maybe he didn't think it was necessary.
> Plaintiff: Judge, how can he know what's necessary? If he hasn't seen the chart.
> ALJ: Well that's why he's a medical advisor.
> Plaintiff: He didn't say it wasn't necessary, Your Honor.
> ALJ: No, he didn't say it was either. But at some point as the Supreme Court has said, a case must come to an end.

(Tr. at 1020-21.) ALJ Fier's reasoning does not make sense. It was necessary for the medical expert to examine all of the medical records in order to make a determination as to plaintiff's disability. ALJ Fier could have asked the medical expert whether those portions of the medical record at issue were necessary for his evaluation, but he did not. Indeed, he refused to in the face of plaintiff's objections. Furthermore, contrary to ALJ's Fier's speculation that the medical expert did not ask for certain evidence because "[m]aybe he didn't think it was necessary," the medical expert later indicated that at least some of the records that he had not seen were pertinent. (Tr. at 1023-25.) Most importantly, ALJ Fier's decision to limit the medical

expert's testimony and review of the evidence contravenes the Appeals Council's mandate to use a medical expert to resolve "*any* conflicts or inconsistencies in the evidence." (Tr. at 767 (emphasis added).)

The record also shows, and defendant concedes, that ALJ Fier ignored the remand order to use a vocational expert to help determine whether plaintiff could perform his past relevant work. (Tr. at 1011 ("No testimony taken of [Vocational Expert] Donald Slive"); Def.'s Reply at 3.) Defendant argues that ALJ Fier's decision not to use the vocational expert was justified because "if substantial evidence supports the ALJ's determination of . . . fully sedentary work, the Commissioner may rely on vocational guidelines without further inquiry of a vocational expert." (Def.'s Reply at 3.) The case that defendant relies on for this proposition, *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982), is distinguishable. *Berry* does not involve a remand order from an Appeals Council, nor does it stand for the proposition that an ALJ may ignore such an order. In sum, ALJ Fier disregarded the Appeals Council's explicit directives. On that basis alone, remand is required.

2.    The Appeals Council Improperly Rejected Dr. Sullivan's Report.

After ALJ Fier denied plaintiff disability benefits, plaintiff submitted new evidence from Dr. Sullivan, his treating physician since 1999, to the Appeals Council. (Tr. at 336.) According to Dr. Sullivan's report:

> Mr. Savino has been unable to work since 1994, due to his persistent pain and limited range of motion of his neck and lower back. In addition to his spinal stenosis, Mr. Savino also has osteoarthritis of both knees with X-ray demonstrating this degenerative disease at least since September 1999.

(Tr. at 337.) The Appeals Council rejected this evidence without explanation. It

merely stated that "[w]e have considered . . . the additional medical evidence submitted from . . . Sullivan, and . . . [w]e found no reason under our rules to assume jurisdiction." (Tr. at 258.) The Appeals Council's failure to provide good reasons for disregarding Dr. Sullivan's opinion constitutes legal error and requires remand. *See Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) (remanding to the Appeals Council "for a statement of reasons on the basis of which [the treating physician's] finding of disability was rejected.").

3.    ALJ Fier Improperly Discredited Plaintiff's Testimony about His Disability.

ALJ Fier found that plaintiff's statements about his impairments and their impact on his ability to work were "not entirely credible." (Tr. at 423, 429.) This decision was based, at least in part, on: (1) the perceived conflict between plaintiff's lifestyle and claimed disability; and (2) plaintiff having returned to work three months after his initial cervical spine fusion in February 1993 and working until November 1994. (Tr. at 423.) The court finds that neither of these reasons provides grounds for disbelieving plaintiff's testimony about his symptoms.

ALJ Fier's only assessment of plaintiff's lifestyle is that plaintiff's claims "are not entirely credible in light of the claimant's own description of his activities and lifestyle . . . ." (Tr. at 423.) ALJ Fier does not identify these activities nor does he explain how these activities are inconsistent with plaintiff's disability claims. Recognizing these deficiencies, defendant attempts to supplement the decision by pointing to testimony that plaintiff: (1) drove to the hearing; (2) usually drives to the supermarket and the park; (3) cooked meals and washed a few dishes; (4) did light

grocery shopping; (5) went fishing occasionally; (6) traveled to the Poconos; (7) took a trip to Atlantic City where he played slot machines and waded in a pool; and (8) took a cruise to Bermuda and danced with his wife. (Def.'s Mem. at 21-22.)

These after-the-fact attempts to fill in the gaps are unavailing because the ALJ's decision itself "*must* contain specific reasons for the finding on credibility . . . and *must* be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7P, 1996 WL 374186 (S.S.A.) (emphasis added); *see also Williams v. Bowen*, 859 F.2d 255, 260-61 (2d. Cir. 1988) (citation omitted) ("A finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligent plenary review of the record."). Moreover, even if ALJ Fier had included this list of activities in his decision, a closer examination of the specific manner in which plaintiff conducted these activities reveals that these activities highlight, rather than undermine, the severity of his limitations.

Plaintiff's ability to travel is quite limited. He testified that he drives "maybe two, three times a week" for distances that are usually six blocks or less. (Tr. at 971-72.) Plaintiff's wife drove the entire way to the Poconos. (Tr. at 73.) The drive lasted "an hour, hour and a half," and after that drive, plaintiff felt "[t]errible . . . [and] had to take [his] pills and lay down in the motel . . . before [he] could do anything." (*Id.*) The drive to Atlantic City lasted about two and one-half hours, and they had to stop every 30-45 minutes. (Tr. at 74.) When plaintiff arrived at Atlantic

City, he felt "[c]rippled." (*Id.*) While there, he played slots for "not long," ate in nice restaurants, and "[s]at in the pool." (Tr. at 66.) When ALJ Fier asked plaintiff if he swam, plaintiff explained: "No, I can't swim no more. I can wade in it but I can't swim no more. My arms don't move right." (*Id.*)

Plaintiff's Bermuda cruise similarly underscores his impairments. Plaintiff spent most of his time on the cruise sitting on a reclining chair and left the ship only once to make a five-minute call. (Tr. at 973-74.) The only activity that may possibly contradict plaintiff's disability claims is his dancing with his wife; however, there is no evidence about how often he danced, what type of dancing he did, or how long the dancing lasted. (Tr. at 974.) While a short slow dance would not appear to be inconsistent with plaintiff's claims of disability, any attempt to tango might be. Each of the ALJs here had the opportunities and affirmative duties to develop such information, but did not. Without this information, the court fails to see how defendant can credibly argue that plaintiff's dancing or other life activities undercut his disability claims.

Furthermore, plaintiff emphasized that he only danced to make his wife happy. (Tr. at 974.) With respect to such conduct, the Second Circuit has held that "[w]hen a disabled person gamely chooses to endure pain in order to pursue important goals, it would be a shame to hold this endurance against him in determining benefits, unless his conduct truly showed that he is capable of working."). *Nelson v. Bowen*, 882 F.2d 45, 49 (2d Cir. 1989). Surely, plaintiff's decision, to endure pain for a small part of one vacation in order to show gratitude

and affection to the person who has cared for and supported him throughout his disability, qualifies as an important goal. Moreover, as explained, there is no evidence that his dancing truly showed that he is capable of working.

With respect to chores, plaintiff's grocery shopping is limited to light items. (Tr. at 70.) He cannot "carry big bags and stuff." (Tr. at 71.) He cannot do laundry because he is unable to carry it up and down the stairs. (Tr. at 70.) He is also unable to dust or vacuum because he "can't move around like that." (Tr. at 71.), He only showers because he is unable to sit in the bathtub. (*Id.*) Plaintiff has trouble shaving because it is difficult for him to hold his razor and keep his right arm up. (*Id.*)

With respect to his hobbies, plaintiff testified the last time he went fishing was in the summer of 1995. (Tr. at 72.) That time, he "[j]ust thr[e]w the hook in the water and s[a]t down [in his lounge chair] and wait[ed] for it to sink and go down." (*Id.*) He did this for "an hour . . . maybe . . . [b]ut [he hasn't] tried it since." (Tr. at 72-73.) He also cannot go to the movies, church, or sporting events because of his limited sitting capacity. (Tr. at 73.) In conclusion, the court finds nothing inconsistent between plaintiff's activities and his disability claims.

The court also fails to see how plaintiff's work from February 1993 to November 1994 conflicts with his disability claims. After plaintiff underwent a cervical fusion on November 11, 1992, he took about three months off to recover and then returned to work, resuming his previous duties. At first, his condition "wasn't too bad," but it progressively worsened over the subsequent year and a half, eventually causing him to quit his job in November of 1994. (Tr. at 953.) ALJ Fier

does not explain how this account discredits plaintiff's testimony, and as explained above, failure to provide sufficiently specific reasons for a credibility determination is legal error.

Finally, ALJ Fier's credibility determination failed to factor in, as it must, plaintiff's long work history, which may be probative of credibility. *See Schaal v. Apfel*, 134 F.3d 496, 502 (2d Cir. 1998) ("ALJs are specifically instructed that credibility determinations should take account of 'prior work record.'"). Plaintiff worked for nearly 17 years as a security guard at the same hospital, and he even made an effort to return to work following his surgery. On remand, the ALJ is instructed to provide sufficiently detailed reasons for its credibility determination and to consider plaintiff's positive work history.

## CONCLUSION

For the reasons set forth above, the Commissioner's motion is denied. Plaintiff's cross-motion is granted to the extent that this case is remanded to the Commissioner for further administrative proceedings consistent with this Order.


SO ORDERED

DATED:      Brooklyn, New York
            July 8, 2009


_____/s/_____
DORA L. IRIZARRY
United States District Judge